# EXHIBIT 1

Edgen Murray Corporation's
First Amended Complaint

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: § § § **PERMICO MIDSTREAM PARTNERS** § **HOLDINGS, LLC**, *et al.*, § § **Debtors** § § § **EDGEN MURRAY CORPORATION,** § § Plaintiff, § § v. § § **PERMICO MIDSTREAM PARTNERS,** § **LLC and HGC MIDSTREAM INV LLC,** § § Defendants. § | | Chapter 11 Case No. 20-32437 (MI) (Jointly Administered) Adversary No. 20-03173 |

**DECLARATION OF JEFFREY BEICKER**

Pursuant to 28 U.S.C. § 1746, I declare as follows:

1. My name is Jeffrey Beicker. I am at least 21 years of age, of sound mind, capable of making this declaration on personal knowledge, and fully competent to testify to the matters stated herein.

2. I was the Chief Executive Officer of Permico Midstream Partners, LLC ("Permico") at the time that Edgen Murray Corporation ("Edgen") and Permico negotiated and entered into Purchase Order Nos. 18101.1002.0003, 18102.1002.0004, and 18106.1002.0003 (collectively, the "Permico POs") for the sale and purchase of a substantial quantity of line pipe ("Pipe").

3. As the individual signing the Permico POs on behalf of Permico, I have personal knowledge of the formation and intent of Permico entering the Permico POs. I also have personal knowledge of the negotiations, discussions, execution, and performance of the Development Loan Agreement, Security Agreement, and other agreements by and between Permico and HGC Midstream INV, LLC ("HGC") (the "HGC/Permico Agreements").

4. Shortly before June 7, 2019, HGC replaced the original investment team that negotiated the HGC/Permico Agreements. After that change, HGC did not provide the funding pursuant to the schedule set out in the HGC/Permico Agreements, including the HGC's

> 4. rejection of the Series A Capital Call Notice that was initially submitted on June 18, 2019. Pursuant to the HGC/Permico Agreements, HGC was to fund the Capital Call amount within five business days, but failed to do so. HGC rejected that initial Series A Capital Call and subsequent revisions to the Capital Call by Permico in order to obtain the necessary funding. HGC's funding was critical to Permico's ability to reach "Financial Close," which was the point at which Permico would have the funding necessary to pay for the Pipe. HGC's failure to provide the requested funding jeopardized Permico's ability to get to Financial Close as intended.

5. In August 2019, and despite prior disclosure of the Permico POs, HGC claimed to me that they had just realized that pipe was soon to be shipped and that the funding to be provided by HGC would not meet the Permico's obligation for the pipe orders. During conversations with HGC in late August and early September 2019, I reminded HGC that HGC's funds were never intended to pay for the pipe orders, but HGC's funding was critical to Permico's ability to secure the funding for those orders at Financial Close. Additionally, I advised HGC that its funding delays in June through August were delaying Financial Close, which put the entire Project at risk, including Permico's ability to secure financing for payment of the pipe orders and other obligations. In that same conversation, I advised HGC's representative that Permico would not be able to, nor would it accept, delivery of the Pipe because of the delays in Financial Close caused by HGC's failures to provide funding.

6. Attached to this Declaration as Exhibit 1 is a true and correct copy of a letter that I sent to HGC and HGC's counsel on August 21, 2019, that sets out in more detail the impact that HGC's lack of funding had on the project. This letter was filed of record in the Chapter 11 Case.

7. At the same time I was having discussions with HGC concerning the status of HGC's funding and its impact on the project, I advised Edgen that if it wished to sell the Pipe, Permico would not object due to the delayed funding for the project. I also instructed Jason Holland of Oso Development Partners, LLC ("Oso") to take any action needed to ensure that the Pipe was not delivered to Permico, including making arrangements or agreements between Permico, Edgen, and Swan Pipeline Services, LLC ("Swan") to act consistently with this instruction, among other things.

8. Edgen commenced shipping of the Pipe to the Swan Yards during the second week of September 2019.

I declare under penalty of perjury that the foregoing is true and correct. Executed on September __, 2022.

/s/ Jeff Beicker
Mr. Jeff Beicker

Permico Midstream Partners Holdings, LLC
c/o Permico Energia LLC
9301 Southwest Freeway, Suite 308
Houston, TX 77459

August 21, 2019

HGC Midstream INV LLC
300 Frank W. Burr Blvd., STE 52
Teaneck, New Jersey 07666
Attention: Taewon Jun
E-mail: taewon.jun@hanwha.com

Re: Funding Requests

Dear Sirs:

We refer to the Amended and Restated Limited Liability Company Agreement of Permico Midstream Partners Holdings, LLC, dated as of April 30, 2019 (as amended and in effect on the date hereof, the "LLC Agreement"), by and among Permico Midstream Partners Holdings, LLC (the "Company"), Permico Energia LLC, Conquista Energy Services, LLC, and HGC Midstream INV LLC (the "Series A Member"). Capitalized terms used but not defined herein have the meanings given in the LLC Agreement.

Before execution of the LLC Agreement, the parties had discussed and highlighted a fundamental element in order for the Project to run smoothly as between the parties, which is that the Series A Member would need to quickly orient itself to understand how midstream project development in the United States operates in order for the Series A Member to timely fund capital contemplated in the LLC Agreement. The following timeline reveals a consistent and continued failure on the part of the Series A Member to understand midstream development, which has resulted in failures to fund during this critical development period.

    **I.**     Timeline

    a.     Refusal to Fund First Capital Call Notice

On June 18, 2019, the Company delivered a Series A Capital Call Notice (the "First Capital Call Notice") to the Series A Member requesting a Series A Capital Call in the amount of

# Exhibit 1

HGC Midstream INV LLC
Attention: Taewon Jun
August 21, 2019
Page 2

$22,500,000. On June 21, 2019, the Company received a Capital Call Dispute Notice relating to the First Capital Call Notice from the Series A Member. The Series A Member disputed the capital call based on what it described as insufficient information. The Series A Member requested for the Company to withdraw its capital call request and submit a request for only for those invoices that were in hand and due and owing, and in exchange, the Series A Member said it would review the fuller request for funding, which involved funds requested for Approved Purposes, but for which an invoice had not yet been received by the Company. The Series A Member agreed to promptly respond to the Company after it had sufficient time to more fully understand the budget and provide the Company with any questions or concerns it had regarding the unfunded portion of the First Capital Call Notice amount. In reliance on this assurance, the Company agreed to withdraw the First Capital Call Notice and send a new Series A Capital Call Notice in the amount of $6,087,160 (the "Revised Capital Call Notice"), which it did on June 28, 2019 and submitted a Revised Capital Call Notice in a reduced amount comprised of the total value of specific and in hand invoices, and a cushion of $2 million. As of the writing of this letter, the Company is still waiting to receive the promised response from the Series A Member with respect to the original amount requested in the First Capital Call Notice.

        b.    <u>The Development Budget: Fundamentally Consistent, But Evolving With the Project</u>

The Development Budget is included as an attachment to the LLC Agreement. It is a body of work that was reviewed, negotiated and understood by all parties to be an important part of the LLC Agreement. The Series A Member understood the Development Budget, which was orally confirmed on many occasions by representatives of the Series A Member present in the negotiations. The Development Budget sets forth the main items of anticipated spending along with timelines and amounts. As with any project though, specific budgetary items may shift in amount or in terms of timeline. For instance, if the Company is able to manage greater efficiencies for the Project, it should do so, which would require necessary deviations in the budget. Likewise, where the Company experiences an impact to timeline because of third party activity, the Development Budget (and the development milestones included therein), must be amended to account for such deviations. During the course of the Project, the Company has determined that certain modifications are necessary to the Development Budget in order to react to and navigate current realities of the Project; such modifications are needed to continue to move the Project toward financial close and, just as importantly, to continue to progress commercial negotiations with potential customers and maintain market credibility. Financial close goes hand in hand with a solid progression of negotiations with customers of the Project. One cannot be accomplished without the other. All of that having been said, despite normal and necessary shifts and movements in the Development Budget and the development milestones schedule, as can be expected on any development project, the Development Budget remains fundamentally consistent and in line with the original intentions of the parties. The overall projection of an approximate $80 million dollar spend (consistent with the amount the Series A Member agreed to fund) remains consistent in the amended Development Budget. The amended budget reallocates funds to contingency, which means that the Company plans to lower costs as the timeline is shifted. As the Company has

HGC Midstream INV LLC
Attention: Taewon Jun
August 21, 2019
Page 3

emphasized to the Series A Member, no additional development capital is needed, but rather, the amended budget reallocates funds in a way that lowers the overall spend during the development phase. The amended budget meets all necessary requirements in order to meet Project Equity Finance and Project Debt Finance from both a financing and timeline perspective. The Company still expects to meet Project Equity Finance and Project Debt Finance well before the Long-Stop Date.

    c.  <u>Efforts to Try to Ensure Smooth Funding Going Forward</u>

The Company contacted the Series A Member to request a meeting, with the purpose of the meeting to determine a process going forward to ensure that subsequent capital calls could be funded in a timely manner and consistent with the terms and the intentions of the LLC Agreement. The Company also reached out to senior management of the Series A Member on June 21, 2019, expressing concern over the issues and difficulties with the First Capital Call Notice, specifically citing concerns that the local representatives of the Series A Member may lack the necessary understanding to fund the Project consistent with the LLC Agreement. Further, on June 18, 2019, Jeffrey Beicker (representing the Company) had dinner with Taewon Jun (member of the Board appointed by the Series A Member) wherein Mr. Beicker expressed serious concerns over funding issues. Mr. Jun confirmed that the local representatives of the Series A Member would provide quick responses to requests from the Company and would quickly review information provided by the Company and furthermore, could handle funding requirements for the Project. He also assured Mr. Beicker he would assist if there were any problems in any such respects. On July 18th and 27th and also on August 2 and 3, 2019, the Company reached out to Mr. Jun requesting assistance and as of the date of this letter the Company has not received a response to any of such requests. Mr. Beicker also sought assistance from Moon-ghee Ryu in his capacity as a senior manager with the Series A Member. Mr. Ryu called Mr. Beicker on July 27th and advised that he would be in Houston, Texas the week of August 5th and that he would meet with the Company and the local Series A Member team members to look into the concerns of the Company around funding and just generally around the Series A Member's handling of the Project. No further response was received from Mr. Ryu in connection with the telephone call and Mr. Ryu did not meet with any representatives of the Company during the week of August 5th nor was any feedback received from Mr. Ryu on the occurrence and outcome of any internal meetings held by the Series A Member during Mr. Ryu's visit to Houston. On August 1, 2019, Mr. Beicker sent an email plea to both Mr. Jun and Mr. Ryu asking for a return phone call in order to address the dire nature of the situation. To date, no response has been received by anyone at the Series A Member.

    d.  <u>Repeated Series a Member Requests for Information and Repeated Quick and Fulsome Responses from the Company</u>

The Series A Member has repeatedly requested information from the Company, often in the form of a formal written questionnaire. On countless occasions, the Company has responded to written questions submitted by the Series A Member. In response, and as in every case, the Company responded promptly and fully. The Series A Member continues to respond that unclear or insufficient information has been provided; but in every case where the Company has

HGC Midstream INV LLC
Attention: Taewon Jun
August 21, 2019
Page 4

provided a written response, an oral response and/or documentation/reporting, never has the Series A Member come back the Company with specific feedback requesting further clarification or information on the information that has been provided by the Company to enable a resolution to an item and move forward.

      e.      Refusal to Fund Second Capital Call Notice

Representatives of the Company and the Series A Member met on July 12, 2019 to address questions submitted by the Series A Member as well as to discuss the Company's Development Budget to ensure a smooth process going forward with respect to funding future capital calls. The Company answered all written and verbal questions of the Series A Member and by all accounts the meeting was a success. After the meeting the Company received no follow up questions or concerns from the representatives of the Series A Member. With no further issues raised by the Series A Member, the Company delivered a second Series A Capital Call Notice (the "Second Capital Call Notice") to the Series A Member on July 24, 2019 in the amount of $12,040,390. In advance of this notice, the Company provided an updated budget dated July 19th. Further, the Company requested the Series A Member approve the previously submitted amendment to the Development Budget, as had been previously discussed with the representatives of the Series A Member. On July 26th, 2019 the Company received a Capital Call Dispute Notice relating to the Second Capital Call Notice from the Series A Member, in it stating that the Series A Member needed further time to internally review. This second dispute notice received from the Series A Member was unexpected by the Company, especially given the recent July 12th meeting in which the Series A Member appeared to finally understand the development process. Not only did the Company receive a rejection on its capital call request, but as of the date of this letter, no response has been received from the Series A Member in relation to the Company's request for approval of the amendment to the Development Budget.

Representatives of the Series A Member suggested again that the Company withdraw the Second Capital Call Notice due to the extensive amount of time needed to further review submitted information and request funding solely for amounts for which the Company had actual invoices in hand. Based on its negative experience around the rejection of the First Capital Call Notice and the Series A Member's commitment to review budgeted amounts for which an invoice was not in hand, the Company declined to withdraw (and still has not withdrawn) the Second Capital Call Notice and submit a limited request. The Company disagrees with the funding structure being pushed by the Series A Member, which does not recognize the need to prefund the Project; the Series A Member's position on prefunding (x) is not consistent with the LLC Agreement, (y) does not provide the Company any certainty of funding. The Company's management of the Project is based on a funding model that requires prefunding based on estimates prepared by the Company, which are then subsequently trued up based on actual invoices received by the Company. The Series A Member has made it clear that it does not or cannot comprehend the pre-fund management model as is contemplated in the LLC Agreement, but instead will only allow for funding to occur on an actual-invoices-received basis. This difference is now at the heart of the problems faced by the Project, especially given that the Company does not have the ability

HGC Midstream INV LLC
Attention: Taewon Jun
August 21, 2019
Page 5

to incur any new payment obligations for the Project based on the fact that the Company cannot rely on any Series A Member funding (even on an actual-invoices-received basis).

        f.        <u>Company Request for Emergency Meeting</u>

In response to the Capital Call Dispute Notice received on July 26th, 2019, on the same day the Manager of the Company requested an emergency meeting of the Members set for August 5, 2019. The Series A Member requested that the emergency meeting be delayed until the Company met with the Series A Member's technical advisor. The Series A Member informed the Company that in July it had hired Arup, which the Series A Member indicated was a midstream technical expert. The Manager agreed to defer the emergency meeting to August 7, 2019, but only on the condition that the Development Budget was approved by the end of the meeting with the Series A Member and its technical advisor. The Company met with representatives of the Series A Member and Arup on August 5, 2019 for four (4) hours and answered all questions asked; the Company was informed that the answers were satisfactory and that there were no follow up questions, but that the Development Budget was not approved. The Series A Member cited that it needed still further time to reflect internally on the Development Budget. The Manager did not receive any response from the Series A Member to participate in the August 7, 2019 emergency meeting.

        g.        <u>Series A Member Discussions with the Company's Debt and Equity Financial Advisors</u>

Following the meeting with the Series A Member and its technical advisor, the Series A Member requested and the Company arranged for conference calls with SMBC, the Company's senior debt financial advisor, and Macquarie Capital, the Company's equity financial advisor. The Series A Member wanted to hear the advisor's input on the status and progress of the development of the Project. These calls took place on August 8th (call with SMBC) and 9th (call with Macquarie), 2019. The information discussed on the calls was extremely detailed and the advisors' responses to questions from the Series A Member were consistent with responses previously provided by the Company on August 5th, including responses in relation to the Development Budget and the need to have the modified budget and milestone schedule approved. As part of the call with SMBC, the Series A Member prepared and submitted in advance a full list of questions for the agenda of the call. On the call, each agenda item was discussed at length, prompting no further questions from the Series A Member during the call. Further, SMBC conveyed the fact that Lummus, the independent engineer for the Project, is in fact very satisfied with how the Project is being managed and that there are no concerns or questions from Lummus in relation to the Project achieving financial close before the Long-Stop Date. Representatives of the Series A Member appeared satisfied and content with the results of these calls. Once again, there were no further questions or concerns raised by the Series A Member after the calls.

        h.        <u>Invoices Past Due; Company Makes a Partial Draw Request But No Response Yet from the Series A Member</u>

HGC Midstream INV LLC
Attention: Taewon Jun
August 21, 2019
Page 6


Due to the failure to fund the capital calls, beginning in August the Company had invoices that were due and are now past due. In order to meet immediate funding needs, the Company submitted a partial draw request ("Partial Draw Request") on August 7, 2019, which would at least meet the Company's current obligations on invoices received as of that date. Over a week later, on August 15, 2019, the Series A Member responded to the Partial Draw Request with a request for more information (all of which had been previously provided to both the Series A Member and to Arup) and any updates. On the same day, and despite having previously provided the information, the Company delivered all requested information to the Series A Member, now with those updates to account for the time period between the Partial Draw Request date (Aug 7) and August 15. At the same time, the Company again advised the Series A Member that a significant amount was now past due. Approximately nine (9) days after the Company's submission of its Partial Draw Request, on August 16, the Series A Member informed the Company that it could not access the file-share data uploaded by the Company back on August 7. That same day, on August 16th, the Company researched the question of access and while finding no issues, completed a refresh to the system to ensure continued access for the Series A Member. As of the date of this letter, the Series A Member has yet to provide any further response or feedback or any indication on whether it expects to fund the Partial Draw Request. By the end of August, without further funding by the Series A Member, over twenty-five (25) different vendor invoices will be in default, a fact which was conveyed to the Series A Member earlier in the month. Beyond defaulting on invoices, the Project continues to encounter growing concerns in the market about its ability to continue to fund. The Company is now in a position where senior management is spending a substantial amount of time performing 'damage control' with vendors, customers, potential customers and others. Continued momentum and a solid perception in the market is critical to finalizing commercial agreements. The stand down orders to the right of way team and a failure to meet obligations continues to further damage the Project's perception in the market.

    **II.**    **Current Status**

    a.  <u>The Company Continues to Try to Work With the Series A Member</u>

The Series A Member's continued and persistent failure to fund capital call requests now leaves the Company unable to pay expenses due, puts the Project in jeopardy by placing commercial arrangements already agreed at risk and significantly impacts the Project timeline. All expenses for which funding has been requested are for Approved Purposes and are within the fundamental parameters and intentions of the original Development Budget and meeting the amended Development Budget (as submitted by the Company)(the Second Capital Call Notice was based on the amended Development Budget as discussed between the parties and proposed and submitted by the Company). The Company has met with representatives of the Series A Member on numerous occasions. The Company has proposed meetings with the Series A Member to which the Series A Member failed to respond. On several occasions, the Company has reached out to senior management of the Series A Member. The Company has met with the Series A Member's technical consultant. The Company has devoted one person full time to satisfy the Series A Member's requests for information, which has been to the detriment of that person's other

HGC Midstream INV LLC
Attention: Taewon Jun
August 21, 2019
Page 7

duties for the Project. In fact, issues around funding now consume approximately one-third of Mr. Beicker's time in addition to the 'damage control' meetings and conversations mentioned above. Eight (8) formal reporting initiatives have taken place, with numerous other less formal requests for information having been fulfilled. The information flowing from the Company to the Series A Member has been and remains transparent, constant and full bodied. The Company provides responses to requests for information in a timely and efficient manner—often times immediately being able to fulfill requests. Further, the Company has and continues to offer an open line of communication to respond to any and all questions of the Series A Member and its advisors. All of this has been despite the fact that it was made clear and agreed between the parties during the negotiation of the definitive documents that the reporting obligation was not meant to overwhelm the Project and unnecessarily exhaust current Project resources. At one point the Series A Member suggested that the Company should hire an additional resource to help manage the reporting process; the Company does not feel it is in a position to hire an additional resource without a clear line of sight going forward on reliable and consistent funding from the Series A Member.

Nevertheless, the Series A Member disputes each capital call request for funding, refuses to approve an amended budget and milestone schedule, and demonstrates a lack of cooperation or willingness to engage with the Company to carry out development of the Project. The main response received from the Series A Member is to request information, which is almost always information that has already been provided. Many times, the Company's communications to the Series A Member are met with significant and material delay or often no response at all. The Company has supplied all available information and answered all questions posed by the Series A Member in an effort to satisfy the Series A Member and has offered to spend more time with the Series A Member if necessary.

    b.   <u>Capital Call Rejections Not Made in Good Faith</u>

Each Capital Call Dispute Notice delivered from the Series A Member is without proper justification and therefore is not in good faith. It is without merit that the Series A member cites its failure to fund based on modifications to the Development Budget. The Development Budget has changed and will continue to change with the progress of development of the Project. The Series A Member cannot rely on the fact that the Development Budget is modified as a good faith reason not to fund when it is the Series A Member that refuses to consider or agree to a modified Development Budget as proposed by the Company, this even after the Company, SMBC, Macquarie Capital, Wood Mackenzie and Lummus have all confirmed that the Project is developing in a manner consistent with (or actually better than) most midstream projects in this space.

    c.   <u>Nuisance Claim</u>

The Series A Member has received a letter by an individual asserting an ownership interest in OSI Petro LLC. The Company reiterates its representation and warranty to the Series A Member that OSI Petro LLC is wholly-owned by Jeffrey Fred Beicker. The individual's claim is nothing more than a nuisance claim. Now that additional details and documents have been

HGC Midstream INV LLC
Attention: Taewon Jun
August 21, 2019
Page 8

provided to the Series A Member regarding the claim, the existence of this claims is not a proper basis upon which to withhold funding to the Project. The Company has and continues to make itself available to answer any and all questions related to this nuisance claim. The Company is active in its efforts to manage and dispose of this claim and will keep the Series A Member up to date with the status of this claim.

> d. <u>A Continuous Failure to Fund by the Series A Member Will Cause Irreversible Damage to the Project</u>

The Company has notified the Series A Member on multiple occasions of the serious and material impact of the Series A Member's failure to fund. The Company now finds itself in a position where it is unable to rely on the ability of the Series A Member to timely and adequately fund capital call requests as contemplated by the LLC Agreement. The damage to the Project continues and at some point will become irreversible. For example, the Company recently had to "release" the scheduled right of way team as a result of the Series A Member's unwillingness to fund. The Company verbally notified the Series A Member of the right of way team issue well in advance, as part of the First Capital Call Notice included monies for the right of way team. In writing at a July 12th meeting, the Company provided a detailed written proposal for right of way consistent with information previously discussed and informed the Series A Member again of the issues and consequences of failing to fund the right of way team's work. As warned by the Company, the release of the right of way team gave rise to rumors in the market that the Project is "dead" because the Company has lost its funding. Furthermore, bringing back online a right of way team will not necessarily happen over night and fit neatly within the timetable set forth. Getting back the right of way team will come at greater expense now and almost certainly with an impact to the timeline (the right of way team is now working on other projects, which provides a limitation of the availability of resources that could delay the timeline). By way of another example, the Company's pipe suppliers are getting calls from people asking if the pipe for the Project is for sale. It could reasonably be expected that this information/rumors are likely to spread to the other stakeholders in the Project, as also warned by the Company. The ramifications of the Series A Member's continued course of conduct (or, said differently, the Series A Member's inability to act/fund) are substantial and likely to cause material and adverse harm, which directly impacts the Company's ability to achieve Project Debt Financing and Project Equity Financing by the revised scheduled date (which is still well in advance of the Long Stop Date).

> e. <u>Company Left With No Alternative But to Seek Additional Third Party Capital</u>

At this point, the actions of the Series A Member have left the Company with no choice but to seek additional third party capital. In order to protect the invested capital of the Members of the Company (including the Series A Member), the Manager of the Company must now seek third party capital in order to replace the funding gap caused by the Series A Member's consistent failure to fund. The Company can only hope that it will be able to timely achieve such additional funding in order to hopefully keep the Project on track.

HGC Midstream INV LLC
Attention: Taewon Jun
August 21, 2019
Page 9

### III. Path Forward

The Company plans to work with its financial advisors to arrange for additional third party funding. The third party capital will be used to prepay the loans outstanding under the Development Loan Agreement; and as necessary, manage the redemption/conversion option described herein. Specifically, the Series A Member may elect either to have its Series A Membership Interests (i) redeemed or (ii) converted to Common Units. If the Series A Member elects the second option of conversion, the parties will need to immediately discuss this option to agree the path forward. The Company requires that the Series A Member advise immediately as to whether it is electing redemption or conversion. The Company requires your response within five (5) Business Days of the receipt of this letter. A quick decision is required in order to allow the Company to immediately proceed with its additional third party capital raise to ensure that the Project can move forward without further material impact to the timeline and overall costs and to mitigate the damages already caused.

The Company remains, as always, available for meetings or calls to discuss any of the above or to address any concerns or questions.

Sincerely,

PERMICO MIDSTREAM PARTNERS HOLDINGS, LLC

By: Permico Energia LLC, as Manager


By: _____
Name: Jeffrey F. Beicker
Title: Manager

cc: Sehwan Park
  Email: sean.park@hanwha-usa.com

  Haeyoung Lee
  Email: harris.lee@hanwha-usa.com

  Moon-ghee Ryu
  Email: moonghee@hanwha.com

  Skadden, Arps, Slate Meagher & Flom LLP
  1440 New York Avenue, N.W.
  Washington, D.C 20005
  Attention: Lance Brasher
  Facsimile: 202-661-8259
  Email: lance.brasher@skadden.com