## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| In re: | § Chapter 11 |
| | § |
| | § Case No. 20-32437 (MI) |
| PERMICO MIDSTREAM PARTNERS HOLDINGS, | § |
| LLC, *et al.*, | § (Jointly Administered) |
| | § |
| Debtors.[1] | § |
| | § |
| | § |
| | § |
| EDGEN MURRAY CORPORATION, | § |
| | § |
| Plaintiff, | § |
| | § |
| v. | § Adversary No. 20-03173 |
| | § |
| PERMICO MIDSTREAM PARTNERS, LLC | § |
| And HGC MIDSTREAM INV LLC, | § |
| | § |
| Defendants. | § |
| | § |
| | § |
| | § |

## DEFENDANT AND COUNTER-PLAINTIFF HGC MIDSTREAM INV LLC'S ANSWER TO EDGEN MURRAY CORPORATIONS FIRST AMENDED COMPLAINT AND FIRST AMENDED COUNTERCLAIM AGAINST EDGEN MURRAY CORPORATION
### (Relates to Doc. No. 98)

Defendant and Counter-Plaintiff HGC Midstream INV LLC ("HGC") files this Answer to

the First Amended Complaint (the "Complaint") filed by Plaintiff Edgen Murray Corporation

("Edgen Murray" or "Plaintiff") and First Amended Counterclaim against Edgen Murray, and

would respectfully show as follows:

---

[1] The Debtors in these chapter 11 cases and the last four digits of their federal tax identification numbers are as follows: Permico Midstream Partners Holdings, LLC (6374) and Permico Midstream Partners LLC (7902). The location of the Debtors' corporate headquarters and service address is 9301 Southwest Freeway, Suite 308, Houston, TX 77074.

## HGC'S ANSWER TO PLAINTIFF'S FIRST AMENDED COMPLAINT

1.      HGC admits the allegations contained in Paragraph 1 of the Complaint, based on information and belief.

2.      HGC admits the allegations contained in Paragraph 2 of the Complaint, based on information and belief.

3.      HGC admits that this Court has jurisdiction and further alleges that the Court has authority to decide this dispute pursuant to 11 U.S.C. § 506.

4.      HGC admits that this is a core proceeding.

5.      HGC admits the allegations contained in Paragraph 5 of the Complaint.

6.      HGC admits the allegations contained in Paragraph 6 of the Complaint.

7.      HGC admits that it agreed to provide the bulk of the funding for Holdings' $79.7 million Development Budget (as defined in the Development Loan Agreement) for the Project, which was to provide funding for the Development Phase to enable Holdings to achieve Financial Close.  HGC also admits the third sentence of Paragraph 7.  HGC further admits that HGC loaned Permico $30 million (the "Secured Loan") and provided an additional capital contribution of approximately $6.1 million of a $22.5 million capital call made by Permico.  HGC denies that it prevented Permico from achieving Financial Close by failing to contribute the additional $39 million in development funds commitment pursuant to the Development Budget.  As to the remaining allegations, HGC lacks information or knowledge sufficient to form a belief as to the allegations in Paragraph 7 of the Complaint, and, therefore, denies such allegations.

8.      HGC admits that with the exception of the below-defined Final PO 18101, each of the Permico POs contain the language as quoted in Paragraph 8 of the Complaint, but denies the

2

remaining allegations as stated, including because HGC lacks information or knowledge sufficient to form a belief as to them.

9.      HGC admits the allegations Paragraph 9 of the Complaint based on information and belief.

10.      HGC lacks information or knowledge sufficient to form a belief as to the allegations in Paragraph 10 of the Complaint, and, therefore, denies such allegations.

11.      HGC denies the allegations in Paragraph 11 of the Complaint.

12.      HGC lacks information or knowledge sufficient to form a belief as to the allegations in Paragraph 12 of the Complaint, and, therefore, denies such allegations.

13.      HGC denies the allegations in Paragraph 13 of the Complaint.

14.      HGC denies the allegations in Paragraph 14 of the Complaint.

15.      HGC admits that all or substantially all of the Pipe was delivered to the Swan Yards before February 2020.  HGC further admits that Permico paid Swan $114,979.07 on October 1, 2019.  HGC additionally admits that Edgen Murray paid certain amounts to Swan on behalf of Permico in connection with invoices to Permico from Swan for services rendered pursuant to the Swan–Permico MSA and associated Work Orders.  As to the remaining allegations, HGC lacks information or knowledge sufficient to form a belief as to the allegations in Paragraph 15 of the Complaint, and, therefore, denies such allegations.

16.      HGC lacks information or knowledge sufficient to form a belief as to the allegations in Paragraph 16 of the Complaint, and, therefore, denies such allegations.

17.      HGC admits the allegations contained in the first sentence of Paragraph 17 of the Complaint.  HGC denies the remaining allegations as stated in Paragraph 17.

13623965

18.     HGC admits the allegations contained in the first sentence of Paragraph 18 of the Complaint.  HGC also admits that it responded to Edgen Murray's February 7, 2020 letter on February 11, 2020 and that its letter asserted in part that "title to the Goods passed to Permico when they were delivered to Permico . . . ."  HGC denies that it "threatened" Edgen Murray with litigation if it failed to acquiesce to HGC's assertion of lien rights by February 18, 2020.  HGC lacks information or knowledge sufficient to form a belief as to the remaining allegations in Paragraph 18 of the Complaint, and, therefore, denies such allegations.

19.     HGC denies that delivery and acceptance have not occurred.  HGC admits that the Permico POs state: "All delivered quantities must be verified and approved by Buyer or Buyer's agent and shall meet all other requirements of Delivery (as defined in Exhibit A)."  HGC admits that Permico's counsel stated on February 12, 2020, that "Permico has not verified or approved the pipe, Delivery has not occurred, title has not passed, and Hanwha has no security interest to assert."  As to the remaining allegations, HGC lacks information or knowledge sufficient to form a belief as to the remaining allegations contained in Paragraph 19 of the Complaint as stated.

20.     HGC denies the allegations as stated in Paragraph 20 of the Complaint.

21.     HGC denies the allegations as stated in Paragraph 21 of the Complaint.

22.     HGC denies the characterization of HGC conduct and actions in Paragraph 22. HGC lacks information or knowledge sufficient to form a belief as to the remaining allegations in Paragraph 22 of the Complaint, and, therefore, denies such allegations.

23.     Paragraph 23 contains no factual allegations to which a response is required.  To the extent it contains factual allegations, such allegations are denied.

24.     HGC admits the allegations concerning the existence of the real, substantial, and justiciable controversy among the parties contained in Paragraph 24 of the Complaint.  HGC lacks information or knowledge sufficient to form a belief as to Permico's position.

25.     HGC denies the allegations contained in Paragraph 25a.-g. of the Complaint.

26.     Paragraph 26 contains no factual allegations to which a response is required.  To the extent it contains factual allegations, such allegations are denied.

27.     HGC denies the allegations contained in Paragraph 27 the Complaint.

28.     HGC admits that Swan acted on behalf, and subject to the control, of Permico, including as the agent of Permico.  HGC denies the remaining allegations as stated in Paragraph 28

29.     HGC admits the allegations concerning the existence of the real, substantial, and justiciable controversy among the parties contained in Paragraph 29 of the Complaint.  HGC lacks information or knowledge sufficient to form a belief as to Permico's position.  HGC denies the allegations contained in Paragraph 29a.-g. of the Complaint.

30.     Paragraph 30 contains no factual allegations to which a response is required.  To the extent it contains factual allegations, such allegations are denied.

31.     Paragraph 31 contains no factual allegations to which a response is required.  To the extent it contains factual allegations, such allegations are denied.

32.     HGC denies that Plaintiff is entitled to any of the relief requested in the "Prayer for Relief" section of its Complaint.

## AFFIRMATIVE AND ADDITIONAL DEFENSES

33.     Plaintiff's claims are barred in whole or in part by the doctrines of waiver, quasi-estoppel, and estoppel.

13623965

34.     Plaintiff's claims are barred in whole or in part by the doctrines of modification, amendment, and novation.

35.     Any interest of Plaintiff in the Pipe is junior to the first priority interest of HGC. *See infra.*

## HGC'S COUNTERCLAIM FOR RELIEF

36.     HGC is a special purpose entity formed to invest in a project for the development of a Y-Grade transportation and fractionation system connecting the Permian Basin to Corpus Christi and purity product end markets, including gathering pipelines, Y-Grade long-haul pipelines, fractionators, an ethane purity product pipeline, Y-Grade and purity product storage, and an LPG export terminal (the "Project").

37.     HGC is part of the Hanwha group, a Fortune Global 500 company based in South Korea whose business spans many industries, including chemicals and materials, aerospace and mechatronics, solar energy (manufacturing, power plant development and EPC), finance, engineering & construction, and services.  HGC is a creditor and party-in-interest in the Debtors' chapter 11 cases.

38.     Debtor Permico Midstream Partners LLC ("Permico") was originally formed by Permico Energia LLC ("Energia") on October 24, 2017 as a member-managed Texas limited liability company.

39.     Debtor Permico Midstream Partners Holdings, LLC ("Holdings") is a Texas limited liability company formed on February 5, 2019.

40.     Plaintiff Edgen Murray sold pipe to Permico for the Project.

## JURISDICTION AND VENUE

41.     This Court has subject matter jurisdiction over this adversary proceeding and counterclaim pursuant to 28 U.S.C. §§ 157 and 1334 and 11 U.S.C. § 506, and by order of the

13623965

United States District Court for the Southern District of Texas referring to this Court all cases and proceedings in this District arising in or related to a case under Title 11 of the United States Code.

42.     This is a core proceeding arising under 28 U.S.C. § 157(b)(2)(A), (K), and (O).

43.     Venue is proper in this court pursuant to 28 U.S.C. § 1409.

44.     HGC consents to the entry of final orders or judgment by the bankruptcy judge if it is determined that the bankruptcy judge, absent consent of the parties, cannot enter final orders or judgment consistent with Article III of the United States Constitution.

## FACTUAL BACKGROUND

### A.     HGC's Financing of the Project and Security Interest in Permico's Assets

45.     On April 30, 2019, Energia and Conquista Energy Services, LLC ("Conquista") contributed 100% of the limited liability company interests in Permico to Holdings, effective as of February 5, 2019, pursuant to a Contribution Agreement, dated as of April 30, 2019, by and between Energia and Permico (the "Contribution Agreement").

46.     Contemporaneously with the execution of the Contribution Agreement, (i) Permico and Holdings (collectively, the "Debtors") entered into the Amended and Restated Limited Liability Company Agreement of Permico Midstream Partners LLC, (ii) Holdings, Energia, Conquista, and HGC entered into the Amended and Restated Limited Liability Company Agreement for Holdings (the "LLC Agreement"), (iii) HGC subscribed for 100% of the Series A Membership Interests of Holdings pursuant to the Series A Limited Liability Company Subscription Agreement (the "Subscription Agreement"), (iv) HGC and Permico entered into the Development Loan Agreement (as amended and in effect on the date hereof, the "Development Loan Agreement"), by and between Permico and HGC, and HGC made a $30 million secured loan to Permico pursuant to that agreement, (v) Permico entered into the Security Agreement in favor

7

of HGC (the "Security Agreement"),[2] and (vi) Energia and Conquista agreed to (a) guarantee Holdings' obligations under the LLC Agreement and the Subscription Agreement, (b) guarantee Permico's obligations under the Development Loan Agreement, and (c) indemnify Holdings and Permico in respect of their indemnification obligations under the Subscription Agreement and the Development Loan Agreement, in each case, pursuant to the Sponsor Guaranty and Pledge Agreement between HGC, Energia, Conquista, and Holdings (the "Sponsor Guaranty and Pledge Agreement").

47.     HGC agreed to provide the bulk of the funding for Holdings' $79.7 million Development Budget (as defined in the Development Loan Agreement) for the Project, which provides funding for the Development Phase to enable Holdings to achieve Financial Close. As the secured lender under the Development Loan Agreement, HGC loaned Permico $30 million (the "Secured Loan"). As a Series A Member under the LLC Agreement, HGC also contributed approximately $6.1 million in capital to Holdings, with a commitment (if all conditions were met) to contribute an additional $39 million.

48.     Permico granted to HGC, as security for the Secured Loan, a lien on and first priority security interest in, all of Permico's right, title and interest in, to and under the Collateral (as defined in the Security Agreement), including all Goods and tangible property of Permico and all Assigned Agreements (as defined in the Security Agreement), including any and all contracts, letters of intent, easements, licenses, rights of way or other agreements granting Permico any

---

[2] **Exhibit 1**, April 30, 2019 Security Agreement Between Permico Midstream Partners LLC and HGC Midstream INV LLC.

option to purchase, or any right to lease or use, real property, or granting to Permico any other right to or interest in real property.[3]

49.     HGC perfected its security interest on April 30, 2019 in all assets of Permico, whether then owned or thereafter acquired, developed, or created.[4]

50.     As set forth in HGC's objection to *Permico Energia, LLC's Emergency Motion to Dismiss Bankruptcy Cases Pursuant to 11 U.S.C. § 1112(b)*, Permico has been in material default under the Secured Loan since May 2019.  *See* Docket No. 51, Case No. 20-32437.

**B.     HGC's Lien Attaches to the Pipe Upon Its Delivery to Permico**

> **1.     Edgen Murray and Permico Entered into Purchase Orders Providing for Title to Pass to Permico Upon Delivery to the Swan Yards Without Any Condition Precedent**

51.     In May 2019, after the parties entered into the LLC Agreement and the Development Loan Agreement, Permico executed three purchase orders dated May 14, 2019 with Edgen Murray for certain line pipe in the amount of approximately $16,701,102.90, $35,478,460.80, and $29,478,368.00 respectively.  Together with the below-defined "Final PO 18101," the aforementioned instruments are collectively referred to herein as the "Purchase Orders."[5]

---

[3] *See* **Ex. 1** § 2.1

[4] *See* **Exhibit 2**, Report Regarding UCC/Federal Liens for Permico Midstream Partners Holdings, LLC.

[5] **Exhibit 3**, Permico–Edgen Murray Purchase Order No. 18101.1002.0003, EM-HGC019803; **Exhibit 4**, Permico–Edgen Murray Purchase Order No. 18102.1002.0004, EM-HGC019779; **Exhibit 5**, Permico–Edgen Murray Purchase Order No. 18106.1002.0003, EM-HGC019827; **Exhibit 6**, Final Permico–Edgen Murray Purchase Order No. No. 18101.1002.0003, EM-HGC002622.

13623965

52.     With the exception of below-defined Final PO 18101, the Purchase Orders are substantively identical to each other in all respects.   The first page of each Purchase Order contained a description of the Date of Order, the Delivery Terms, Delivered Via, and Delivered to Buyer at (the delivery location):

*Purchase Order No. 18101.1002.0003*

| Description (add schedule if further space required) | | | |
|---|---|---|---|
| Date of Order | Delivery Terms | Delivered Via | Delivered to Buyer at |
| May 14, 2019 | DDP Swan Transportation Yard - Carlsbad, Texas | Unit Train / Best Available – Per Quote | DDP Swan Transportation Yard – Carlsbad, Texas |

*Purchase Order No. 18102.1002.0004*

| Description (add schedule if further space required) | | | |
|---|---|---|---|
| Date of Order | Delivery Terms | Delivered Via | Delivered to Buyer at |
| May 14, 2019 | DDP Swan Transportation Yard – Big Lake, Texas | Unit Train / Best Available – Per Quote | DDP Swan Transportation Yard – Big Lake, Texas |

*Purchase Order No. 18106.1002.0003*

| Description (add schedule if further space required) | | | |
|---|---|---|---|
| Date of Order | Delivery Terms | Delivered Via | Delivered to Buyer at |
| May 14, 2019 | DDP Swan Transportation Yard – Big Lake, Texas | Unit Train / Best Available – Per Quote | DDP Swan Transportation Yard – Big Lake, Texas |

53.     The Purchase Orders also each incorporated an Exhibit A, titled "Purchase Order Terms and Conditions."  As clarified by the Terms and Conditions, **the Purchase Orders define "Delivery" as "Seller's successful delivery of the Goods to the agreed delivery location set forth in the Purchase Orders**."  In other words, "Delivery" was to occur upon the Pipe's arrival at "Swan Transportation Yard – Big Lake, Texas" and "Swan Transportation Yard – Carlsbad, Texas," respectively.  More specifically, Pipe was to be delivered either (1) to a rail terminal located between Loving, New Mexico, and Carlsbad, New Mexico, where it would then be offloaded and taken to a yard located in Orla, Texas, for storage; or (2) to a rail terminal located

13623965

in Big Lake, Texas, where it would then be offloaded and taken to a yard located in McCamey, Texas, for storage.   Collectively, these two yards belonging to Swan Pipeline Services, LLC ("Swan") are referred to as the "Swan Yards."

54.     The Terms and Conditions defined "Delivery Date" as "the date or dates by which the Goods or part of the Goods shall be delivered to the agreed delivery location, as stated in this Purchase Order."

55.     The Purchase Orders further spoke to Delivery in Exhibit C, where they discussed "Delivery Date," stating, "Seller shall complete Delivery of the Goods to Buyer in accordance with the Purchase Order Terms and Conditions of this Purchase Order no later than the Delivery Date listed on the cover of this Purchase Order (each a '*Delivery Date*')."

56.     The Purchase Orders unambiguously provided when title to the Pipe would pass to Permico:

> Title to the Goods shall pass to Buyer upon the earlier of (i) Delivery to Buyer in accordance with this Purchase Order or (ii) payment by Buyer for such Goods.

57.     With the exception of Final PO 18101, the Purchase Orders elsewhere created a security interest in Edgen Murray that was to last until it provided written notice of its satisfaction with Permico's finances, stating that "title to the Goods shall remain in Seller and all delivery obligations of Seller shall be extended until such time as Seller, in its reasonable discretion, provides written notice to Buyer that Seller is satisfied that Buyer has the financing or other funding sources available to pay for the Goods."   In describing Edgen Murray's delivery obligations, the Purchase Orders stated, "Regardless of title transfer, Seller shall assume proper care and custody of, and shall bear all risk of loss to, the Goods and shall either insure or self-insure the Goods for such loss or damage until Delivery occurs."

13623965

58.     Importantly, Edgen Murray agreed to subordinate its security interest in the Pipe to HGC's security interest in the Pipe pursuant to Section 17 of Exhibit A to the Purchase Orders:

> Seller hereby subordinates any mechanics' and materialmen's liens or other claims or encumbrances that may be brought by Seller against any or all of the Goods, Buyer Group's property or any hydrocarbon product associated with such property to any liens granted in favor of Buyer Group's lenders for the Project, whether such lien in favor of such lenders is created, attached or perfected prior to or after any such liens, claims or encumbrances....

Thus, pursuant to the Purchase Orders any lien or claim by Edgen Murray is subordinated to any liens granted in favor of Permico's lender, i.e., HGC.[6]  *See* TEX. BUS. & COM. CODE § 9.339 ("This chapter does not preclude subordination by agreement by a person entitled to priority."). Accordingly, HGC's liens are first in priority and senior to any liens asserted by Edgen Murray.

### 2.     Edgen Murray Contracted with American Pipe for the Construction and Delivery of the Pipe

59.     On May 15, 2019, Edgen Murray executed three purchase orders (the "American Pipe Purchase Orders") with American Cast Iron Pipe Company ("American Pipe") pursuant to which it was to construct the Pipe.[7]  American Pipe agreed to deliver the Pipe to the appropriate rail terminal and to "TAG MATERIAL WITH: PERMICO MIDSTREAM."

### 3.     Permico Engaged Swan Transportation to Receive and Store the Pipe Shipped and Delivered by Edgen Murray

60.     As contemplated by the Purchase Orders, on September 4, 2019, Permico (not Edgen Murray) and Swan entered into a Master Service Agreement (the "MSA").  In work orders issued pursuant to the MSA (the "Work Order"), Swan agreed to perform services with respect to the Pipe being delivered via rail by American Pipe.  Specifically, Swan's obligations to Permico

---

[6] *See* **Ex. 3**, **Ex. 4**, **Ex. 5**, **Ex. 6**.

[7] Initially, the American Pipe Purchase Orders provided for "FOB: Destination" but were later amended to "FOB: Mill."

included unloading the Pipe from the rail, transporting the Pipe to the respective Swan Yard, and
storing the Pipe there.

4.     **Permico and Edgen Murray Enter into Final PO 18101, which Does Not Include
        the Language Edgen Murray Alleges Creates a Condition Precedent to Delivery**

61.     As originally executed on May 14, 2019, PO No. 18101.1002.0003 ("PO 18101")
provided for a purchase price of $35,478,460.80 in exchange for the delivery of 460,520 feet of
Pipe to "DDP Swan Transportation Yard - Carlsbad, Texas." However, on July 11, 2019, Edgen
Murray, OSO Development Partners, LLC ("OSO"),[8] American Pipe, Swan, and L.B. Foster had
a pre-production meeting to discuss the project and coordinate regarding production and delivery
of the pipe.  On July 17, 2019, Jeff Johnson (Edgen Murray's Director of Line Pipe Projects and
Programs) emailed Jason Holland regarding "the revision on the PO for the material going to New
Mexico."  Johnson stated, "We discussed PO 18101 being broken up.  290,400 going to New
Mexico and 170,120 going to Big Lake."  He thus asked Jason Holland, "Can you get us a
revision?"  On July 19, 2019, Jason Holland sent Johnson a revision of PO 18101 ("Final PO
18101"), stating that "I will have the attached signed today," and asking Johnson to "Verify for
accuracy please." Importantly, Final PO 18101 *did not* contain the language that Edgen Murray
now asserts constitutes a condition precedent preventing the passage of title to the Pipe until Edgen
Murray's written notice of its satisfaction with Permico's finances.

62.     Later on July 19, 2019, Jason Holland emailed Johnson and Andy Fox (Edgen
Murray's Project Manager of Welded Pipe) saying, "See attached with the Final PO noting the
delivery into Carlsbad and Big Lake as discussed at last week's pre-production meeting."  Johnson

---

[8] OSO and its president, Jason Holland, provided project management and development services
   to Permico, including coordinating with Edgen Murray. In particular, Jason Holland served as
   "Buyer's Representative" and "Buyer's Purchasing Agent" with respect to the Purchase Orders.

responded, "Thank you sir. We will get the changes processed. Have a great weekend." However, Jason Holland apparently forgot to include Final PO 18101 as an attachment, and shortly followed up by providing Final PO 18101.

63.     The parties made arrangements for the Pipe to be shipped in accordance with Final PO 18101.   They thus clearly acted as though Final PO 18101 represented the operative agreement—indeed, as Edgen Murray's corporate representative confirmed, rather than delivering 460,520 feet of Pipe to New Mexico as originally contemplated, roughly 300,000 feet was sent to Loving, New Mexico, and then transported to Swan's Orla Yard.   In fact, on February 13, 2020—shortly after HGC's notice of lien causing Edgen Murray to scramble to respond—Johnson sent an email to Edgen Murray's then-President, Greg Baker, titled "Permico Fully Exe-cuted POs," and attaching four purchase orders: the three original Purchase Orders and Final PO 18101.

**5.      Swan, on Behalf of Permico, Transported the Pipe to the Swan Yards, Where It Was Stored**

64.     On September 5, 2019, the Pipe began to arrive in Loving, New Mexico, and shortly thereafter began to arrive at rail yards in Texas.  The shipments of Pipe continued on a rolling basis until January 2020, with the majority being delivered by the end of December 2019.  Pursuant to the Work Orders, Swan received the Pipe and transported it to the Swan Yards and thereafter delivered invoices to Permico for these services.  At the time Swan transloaded the Pipe at the rail terminals and transported it to the Swan Yards for storage, the only written agreement with respect to such services was between Permico and Swan.  Permico paid Swan at least $114,979.10 before agreeing to transfer the invoices to Edgen Murray—however, there was never an assignment or transfer of rights under agreements with Swan from Permico to Edgen Murray, nor did Edgen Murray, Permico, and Swan ever into a three-way agreement with respect to the Pipe.  Because Swan was acting as Permico's agent or otherwise solely on behalf of Permico, Swan's offloading

14

of the Pipe at the rail terminals and subsequent transportation of the Pipe to the Swan Yards for

storage constituted delivery to, and possession and acceptance by, Permico.

**C.     Edgen Murray Denies that HGC's Lien Attached to the Pipe**

65.     On January 27, 2020, HGC sent Edgen Murray and Permico notice of HGC's lien

on the Pipe.  Thereafter, a dispute arose as to whether title to the Pipe passed to Permico such that

HGC's lien attached.

66.     Edgen Murray relies on the following provision contained on the cover page of

each Purchase Order other than Final PO 18101 for its contention that title to the Pipe did not pass

to Permico upon Delivery as expressly provided for in Section 16 of the Purchase Orders:

> Notwithstanding any other provision of the Purchase Order and related documents
> (including the Purchase Order Terms and Conditions) to the contrary, Buyer and
> Seller agree that title to the Goods shall remain in Seller and all delivery obligations
> of Seller shall be extended until such time as Seller, in its reasonable discretion,
> provides written notice to Buyer that Seller is satisfied that Buyer has the financing
> or other funding sources available to pay for the Goods....

67.     For one, Final PO 18101, pursuant to which roughly 460,520 feet of Pipe was

Delivered, does not contain this language.  Additionally, this provision is ineffective to prevent the

passage of title to the Pipe.  Section 2.401(a) of the Texas Business and Commerce Code specifically

provides:

> Title to goods cannot pass under a contract for sale prior to their identification to the
> contract (Section 2.501), and unless otherwise explicitly agreed the buyer acquires
> by their identification a special property as limited by this title. **Any retention or
> reservation by the seller of the title (property) in goods shipped or delivered to
> the buyer is limited in effect to a reservation of a security interest.** Subject to
> these provisions and to the provisions of the chapter on Secured Transactions
> (Chapter 9), title to goods passes from the seller to the buyer in any manner and on
> any conditions explicitly agreed on by the parties.

TEX. BUS. & COM. CODE ANN. § 2.401(a) (emphasis added); *see also* TEX. BUS. & COM. CODE

ANN. § 1.201(35) (defining security interest as "an interest in personal property or fixtures which

secures payment or performance of an obligation" and further providing that the "**retention or**

13623965

reservation of title by a seller of goods *notwithstanding shipment or delivery* **to the buyer under Section 2.401 is limited in effect to a reservation of a 'security interest'**" (emphasis added)). Accordingly, the provision relied upon by Edgen Murray at most creates a security interest and did not prevent the passage of title in the Pipe provided for in Section 16 of the Purchase Orders.

## CAUSE OF ACTION

**(Determination of Validity, Extent, and Priority of HGC's Lien and Declaratory Judgment)**

68.     HGC re-alleges and incorporates herein by reference each and every allegation and paragraph set forth previously.

69.     Pursuant to Bankruptcy Rule 7001(2), (9), 11 U.S.C. § 506, and 28 U.S.C. §§ 157, 2201, and 2202, this Court should determine and declare, as follows:

   i)     that HGC has a valid and first priority lien on the Pipe;

   ii)    that HGC's lien was first in time as it was filed of record on April 30, 2019 and was perfected upon attachment—*i.e.*, the passage of title in the Pipe to Permico;

   iii)   that any lien or claim by Edgen Murray is subordinated to the lien granted in favor of HGC.  *See* Exhibits 3–6, Purchase Orders; *see also* TEX. BUS. & COM. CODE ANN. § 9.339; and

   iv)    whether title to the Pipe resides in Permico or Edgen Murray, the Pipe remains encumbered by HGC's liens.

## PRAYER FOR RELIEF

HGC respectfully requests that this Court do the following:

1.  Deny all relief sought by Edgen Murray;

2.  Issue a declaratory judgment and determination that HGC has a valid and perfected, first priority lien on the Pipe, superior to Edgen Murray, the Debtors and any other parties;

13623965

3.  Award HGC its reasonable and necessary attorneys' fees incurred in this declaratory

    judgment action; and

4.  Grant HGC such other and further relief to which it is entitled, including judgment for

    costs.

Respectfully submitted,

**PORTER HEDGES LLP**

By: */s/ Joshua W. Wolfshohl*

    Joshua W. Wolfshohl
    State Bar No. 24038592
    Eugene M. Nettles
    State Bar No. 14927300
    Aaron J. Power
    State Bar No. 24058058
    1000 Main Street, 36th Floor
    Houston, Texas  77002
    Telephone:  (713) 226-6000
    Facsimile:  (713) 226-6295
    E-Mail:  jwolfshohl@porterhedges.com
            enettles@porterhedges.com
            apower@porterhedges.com

**ATTORNEYS FOR DEFENDANT AND
COUNTER-PLAINTIFF
HGC MIDSTREAM INV, LLC**

13623965

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on October 17, 2022, a true and correct copy of the foregoing *Defendant and Counter-Plaintiff HGC Midstream INV LLC's Answer to Edgen Murray Corporation's First Amended Complaint and First Amended Counterclaim Against Edgen Murray Corporation* was duly served to all registered ECF users appearing in the case.

/s/ Joshua W. Wolfshohl
Joshua W. Wolfshohl

18

13623965